IN THE UNITED STATED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHARENA COFFIN AND<br>JOSIE JIMENEZ,<br>    PLAINTIFFS,<br><br>vs.<br><br>WALLER INDEPENDENT<br>SCHOOL DISTRICT,<br>    DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. NO._____<br><br><br><br><br>JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

**I. Preliminary Statement**

1. This is an employment lawsuit brought for race discrimination under 42 U.S.C. § 2000e, the Civil Rights Act of 1964, as amended (Title VII); for hostile work environment, retaliation and discrimination brought within the Texas Commission on Human Rights Act ("TCHRA"), as amended, Texas Labor Code § 21.001 and 21.051; and for disability discrimination under 42 U.S.C. §12101 (ADAAA), as amended by the Amendments Act of 2008.

**II. Parties**

2. During all times mentioned in this petition, Plaintiff, Sharena Coffin ("Coffin"), was and is still a US citizen and a resident of Harris County, Texas. Coffin is a Black female who engaged in protected activity.

3. During all times mentioned in this petition, Plaintiff, Josie Jimenez ("Jimenez"), was and is still a US citizen and a resident of Harris County, Texas. Jimenez is a Hispanic female who engaged in protected activity.

4. During all times mentioned in the Complaint, Defendant, Waller Independent School District ("WISD"), was and is still an employer, engaged in an industry affecting commerce. WISD may be served through its Superintendent, Kevin Moran, 2214 Waller Street, Waller, Texas, 77484.

### III. Jurisdiction

5. Jurisdiction is invoked pursuant to 42 U.S.C. § 1331. The Right to Sue Notices were sent to Jimenez and Coffin from the United States Equal Employment Opportunity Commission ("EEOC") dated on or about July 26, 2018 and July 30, 2018, respectively. All conditions precedent to filing this suit have been satisfied.

6. Declaratory, injunctive, and equitable relief is sought pursuant to federal statute.

7. Compensatory and punitive damages are sought pursuant to federal statute.

8. Costs and attorney's fees may be awarded pursuant to federal statute and Rule 54 of the Federal Rules of Civil Procedure.

### IV. Venue

9. This action properly lies in the Southern District of Texas, Houston Division, pursuant to 28 U.S.C.§ 1391(b) because the unlawful employment practices and other misconduct were committed in this judicial district.

### V. Factual Statement

**Plaintiff Sharena Coffin**

10. Coffin was employed by WISD in August 2016 as a teacher at Schultz Junior High School ("SJHS"). Subsequently, she was promoted to counselor at Waller Junior High School ("WJHS") in July 2017 through June 12, 2018. She had no problems at Schultz and

received good performance evaluations. She was interviewed by a panel for the counselor position and was chosen to be a counselor at WJHS.

11. In July 2017, Colleen Dale ("Dale"; Caucasian female), became the principal of WJHS. At that time Jimenez, had been a counselor at WISD for five (5) years. In or about August 2017, Coffin asked Dale that she be permitted to shadow Jimenez to learn the WJHS way of doing things and to get familiar with her new role as a counselor. Dale denied her the opportunity to shadow Jimenez, who at that time had a great reputation as serving as counselor at WJHS. Dale would send mixed signals because at times she would tell Coffin to get with Jimenez to complete tasks.

12. Coffin began to see what she perceived to be a negative disposition towards Jimenez. For example, there were changes to the master schedule that needed to be done. This required that the counselors (Coffin and Jimenez) to facilitate the changes for accuracy. During a staff training meeting, Dale made a comment regarding inappropriate relationships between staff and students. Coffin was baffled by the comment because there had been no allegations of this nature while she had been there. Later that day, she learned that Dale was referring to a relative of Jimenez' who was no longer working at the school. The comment was inappropriate to Coffin since it had been resolved but it appeared like she was attempting to embarrass and humiliate Jimenez, although she had nothing to do with the incident.

13. Over the next few months, Coffin noticed a lack of communication by Dale with Jimenez. If Dale wanted them to do something, she would leave Jimenez' name off the email. This happened on multiple occasions. Each time, Coffin would forward the emails to Jimenez because it concerned information she should know. On multiple occasions Dale had

meetings with Coffin and other staff members, and she made comments that Coffin believed were demeaning toward Jimenez. For example, Dale said Jimenez was negative and that Coffin should refrain from being around her. At this point, Coffin saw nothing that Jimenez had said or done that made her think she was negative or a bad influence. It was impossible not be around Jimenez because she was the only person in Coffin's department and was informally showing her how things were done at WJHS.

14. Coffin had surgery in June 2017. When she returned to work, she had a prosthetic boot on her foot. She told Dale that due to the prosthetic boot, she could not stand for prolonged periods of time. Dale commented that if she could not stand for prolonged periods of time, then she cannot perform her job duties. She reported the comment to Mike Brooks ("Brooks"), HR Director. He said WJHS could make accommodations and that Coffin could sit down when needed. There was no response from Dale after speaking to Brooks about this issue.

15. In September 2017, Coffin and Jimenez attended a monthly meeting for counselors. They received an email from Dale inquiring of their whereabouts and claiming that something needed to be done with scheduling. Dale told Coffin and Jimenez to make contact with the assistant principal as soon as possible. She made it seem urgent and insinuated that they were missing without reason or goofing off on the job. However, the counselors' meeting held over and caused their delay. Coffin replied to the email and told her the meeting had lasted longer than expected. She never mentioned anything that needed to be done with scheduling, which showed Coffin that Dale was micromanaging their time.

16. Soon after the incident in the previous paragraph, Dale demanded access to Coffin and Jimenez' calendars with details. They complied. However, Dale contradicted this reason

by sending emails asking Coffin her whereabouts when the information was already on the calendar.

17. In the latter part of September, Dale demanded that Coffin attend a meeting every Monday after normal work hours (6:45am to 3:30pm). Coffin was not given sufficient time to make daycare arrangements for her son.  The first Monday meeting was only two days after she gave notice. Coffin asked whether Dale would make the meeting at some time during normal work hours, but she refused. Coffin believes that she was made to attend the meetings every Monday because Dale knew that Coffin had reported her to Brooks. Often, she and Jimenez would show up to the Monday after work meetings only to find that Dale had cancelled them or moved the time to a later time.  While it was routinely on the schedule, they met approximately three times.  Coffin felt this was harassment because of her affiliation or friendship with Jimenez.  However, when Jimenez was removed from Coffin's work assignments, the harassment continued. For instance, Dale started giving her assignments to Caucasian employees like Paula Garcia and Sarah Mocha.

18. Coffin learned from her ex-principal at SJHS that Dale was negatively talking about her to others outside of WJHS.  The harassment and hostility would worsen and frequently Coffin was treated differently than others.

19. Jimenez made a complaint against Dale in or about March 2018, and Coffin was called to meet with Brooks about the complaint and to speak about her contract for the 2018-2019 school year.  Brooks' meeting with her was very odd to say the least. He stated he first wanted to talk about the complaint and then he wanted talk about her contract for the upcoming year.  One of his first questions was "Do you think Ms. Dale is a racist?" He wrote no notes during the meeting which struck Coffin as odd.  She asked him to explain

or clarify his question. He then asked, "Have you ever heard her (Dale) make racial comments?" She responded, no, but told him that she felt Dale treated Jimenez differently than other employees. Then he asked her if she had ever read a book titled "Who Moved My Cheese?" She had not. He explained the book and its overall theme of handling changes in management in an organization. He followed with the question, "Do you feel Ms. Jimenez is struggling with changes within WJHS?" She said no. She felt like he was moving her along to go with his theory of what happened between Dale and Jimenez. When he finally discussed Coffin's contract at the end of the meeting, he told her to talk to Dale and ensure her that she would be loyal and that she was on her team. Coffin asked Brooks what she should do if Dale did not give her confirmation that her contract would be renewed. He responded that resignation would be better than a non-renewal. He said if she resigned as a counselor, WISD would give her a teaching contract at SJHS. She would not agree, because this was a demotion and a drastic cut in pay.

20. By the end of March 2018, teachers and other contract employees were given their renewal contracts; however, Coffin was excluded. She kept inquiring about her renewal contract but was ignored. In April 2018, Dale (with others present) had a conversation with Coffin about her renewal contract. For the first time during the school year, Dale addressed alleged deficiencies in Coffin's work performance. A few days after the meeting, Coffin received a long and detailed memo regarding alleged deficiencies that she discussed plus she added other alleged incidents that had not been discussed in the meeting. The memo was drafted and delivered on Dale's behalf by Jeffrey Brooks, one of the assistant principals who attended the meeting. Coffin hired an attorney to reply to the memo on her behalf. By late to mid-May, it was clear to Coffin that she would receive a non-renewal notice. As such,

she felt forced to resign or face the fact that she would have to explain the non-renewal to other potential employers. Even after she submitted my letter of resignation, the harassment continued.

21. Defendant subjected Coffin to a hostile work environment based on her race and disability, discriminated against based her race and her close association with Jimenez based on her race. She was also retaliated against for supporting a complaint of discrimination and harassment made by WISD in violation of Section 1981, Title VII and the ADA/ADAAA.

**Plaintiff Josie Jimenez**

22. Jimenez was employed by WISD from August 2009 to June 2018. Initially, she was hired as a teacher but was promoted to counselor in August 2012. She was assigned as a counselor to WJHS in August 2012. From August 2012 to July 2017, she worked at WJHS without incident and enjoyed her job. She received above average to outstanding performance evaluations. She had never had a problem with her employment contract being renewed and had always received the renewal contract in or about March of each school year.

23. When Dale was assigned as the principal of WJHS in July 2017, she and Jimenez had a introductory telephone conversation. Among other things, Dale asked Jimenez about her current job duties. Jimenez told her that the duties had recently changed because the WISD wanted to align all middle school procedures for consistency. Dale countered with additional duties that Jimenez would be required to do and stated that she wanted to make sure that Jimenez was trained in case properly in case she wanted to leave. This was very disturbing to her since this was their very first conversation. Jimenez jokingly said, "Are you trying to get rid of me?" Dale said no and then moved abruptly to another subject.

24. In August 2018 during a staff meeting, Dale made a comment regarding inappropriate relationships between staff and students. Jimenez knew she was talking about an incident involving a relative of hers. Others who had been at the school knew as well because the secretary approached her later and stated that she believed the comment was directed at her. Jimenez was very embarrassed and humiliated. There was no reason to discuss this since the relative was no longer employed by WISD.

25. Prior to Dale being hired into WISD, Jimenez' office was always located at the main campus of the school. In August 2017, Dale relocated her to the east wing of the campus with the assistant principals. This was odd because she was separated from Coffin, a first-year counselor who was placed the main building office where Dale worked. When Jimenez asked Dale about the change, she said there was a possibility that no one would be hired as a bilingual assistant for the assistant principals. This was berating and totally unwarranted. Jimenez has two master's degrees and was essentially being forced to do secretarial duties in addition to my regular counselor duties. WISD typically offers a yearly stipend to employees who are bilingual and serve as translators or interpreters. Jimenez requested a stipend but was denied. Regardless, Jimenez was required to interpret or translate without the additional pay.

26. In September 2017, Jimenez and Coffin were required to attend a monthly counselors' meeting. They received an email from Dale asking them about our their whereabouts and claiming that a scheduling matter need to be handled immediately. Jimenez replied by email and told her that the monthly district counselors' meeting had run over and it caused them to be later than expected. Dale insinuated that they were missing without reason or goofing off on the job. She never mentioned anything about the scheduling matter that

initially began her inquiry. At that time, Jimenez believed that Coffin was targeted for working closely with her. Jimenez mentioned to the Counselor Coordinator for WISD that it was a good idea to make the calendar available, and that it would also help if the principals also made their calendars available so that each could know where the other was in case of a student, teacher, or parent emergency.

27. Shortly after this request for reciprocity between the counselors and the principals for calendars, Dale instructed Jimenez to attend a meeting in September 2017 to discuss her concerns about sharing the calendar. Jimenez had no concerns about sharing calendar but as previously stated to the Counselor Coordinator, she believed that exchanging calendars with principals was a good idea. Dale postponed the meeting until October 2017. Once they finally met, Dale told Jimenez that there should not be a struggle between Jimenez, Dale, or Dale's orders. Jimenez denied that there was a struggle and told her that she had complied with her request about the calendar. Dales also said that Jimenez was being viewed as negative by the staff and should stay away from other staff because they were viewed as negative also. She specifically told her to stay away from Richard Forrester, who was responsible for testing, 504 plans, and LEP students at WJHS.

28. In October 2017, Dale required Jimenez to be a secretary for the day in the absence of the assistant principals' permanent secretary. During the day, Jimenez was required to answer phones, check students in and out of the building, and perform other secretarial duties that may have arisen throughout the day.

29. In October 2017, Jimenez was reviewing student test scores and was instructed by Dale, through an assistant principal, not to balance classes, but to put students back into their original, incorrect placements. This was a blatant violation of District policy. When

Jimenez brought this up to the assistant principal, he said it was better for district administrators to yell at Dale rather than Jimenez. This placed Jimenez in a very vulnerable position.

30. After things continued to escalate with Dale, Jimenez reported her conduct to Brooks in October 2017. He told Jimenez to "kill her with kindness," and "walk to her office and say hello every day." At the end of the conversation, he said "You need to do what you had to do." Jimenez asked about transferring to a new school and the process involved. He said transfers had to be approved by both the current and new principal. He said there were no openings.

31. There were numerous other incidents of harassment/discrimination/retaliation including but not limited to:

   a. A district administrator (in a parental capacity) disputed the PEIMS coding for her child and Dale blamed Jimenez for it;

   b. Wrongfully accusing Jimenez of mistranslating or misinterpreting from another employee to a parent of a student;

   c. Instructed Jimenez to "find another job" because Dale desired to fill it with others;

   d. Accusations that Jimenez did not relate well to students;

   e. Told to leave if she was unhappy; Jimenez replied that she was not unhappy and that she had graduated from Waller High School and was personally connected to the school district;

   f. In March 2018, allegations by Dale of job deficiencies that were not true;

   g. Reported harassment again to Brooks about Dale in March 2018;

   h. Finding of "No Harassment" from Dale;

    i. Failure to give Jimenez a contract renewal in March 2018 when all other employees received their contracts;

    j. Told by Brooks that she needed to resign to avoid the negative impact of a non-renewal for future employment;

    k. Filed a grievance on the outcome of the investigation and learned that many witnesses were not contacted;

    l. Lost confidence in the system and retained counsel;

    m. Forced to resign in lieu of a non-renewal; and

    n. Email from potential employer regarding her employment was ignored by Dale, possibly interfering with a future employment.

32. Defendant discriminated against and harassed Jimenez on the basis of her race and Jimenez was retaliated against for reporting racial harassment and discrimination in violation of Section 1981, Title VII and TCHRA.

## VI. Causes of Action

33. Plaintiffs' incorporate, as if re-alleged, paragraphs 1-32.

34. Because Plaintiffs were harassed, retaliated against and forced to resign (i.e., constructively discharged), Defendant has intentionally, maliciously, and willfully violated Title VII and Section 1981, as amended.

## VII. Prayer for Relief

35. Wherefore, Plaintiffs' pray that this Court:

    a. declare the conduct engaged in by Defendant be in violation of Plaintiffs' rights;

    b. enter judgment against Defendant;

    c. enjoin Defendant from engaging in such conduct;

    d. order front salary and benefits for the period remaining until normal retirement;

    e. award Plaintiffs equitable relief of back salary and fringe benefits up to the date of termination and prejudgment interest for that entire period, or front salary and benefits accrual;

    f. award Plaintiffs compensatory damages of $1,000,000.00;

    g. award Plaintiffs costs and attorney's fees; and

    h. grant such other relief as it may deem just and proper.

## VIII. Demand for Jury

36. Plaintiffs demand a jury trial.

Respectfully submitted,

*/s/ Victoria Plante-Northington*
VICTORIA PLANTE-NORTHINGTON
Texas Bar No. 00798436
Southern District No. 21235
PLANTE LAW FIRM, P.C.
5177 Richmond Avenue
Suite 1140
Houston, Texas 77056
Telephone: (713) 526-2615
Facsimile: (713) 513-5176
Email: victoria@plantelawfirm.com

ATTORNEY FOR PLAINTIFFS
SHARENA COFFIN AND JOSIE JIMENEZ